**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **DAVID TALBOT**, |
| Plaintiff, |
| v. |
| **U.S. DEPARTMENT OF STATE** *et al.*, |
| Defendants. |

Case No. 17-cv-0588 (CRC)

## MEMORANDUM OPINION

Over a half-century after President Kennedy's assassination, theories still abound as to who was responsible. Investigative journalist David Talbot points the finger at the Central Intelligence Agency ("CIA"). In a quest for supporting evidence, Talbot filed Freedom of Information Act ("FOIA") requests with the CIA and the State Department for passport and travel records of two deceased CIA agents who Talbot suspects were aware of the agency's involvement in the assassination, or worse. Talbot apparently seeks the records in order to link the agents' comings and goings to the known whereabouts of other characters in the continuing whodunit.

In this suit, Talbot challenges the adequacy of the agencies' searches in response to his requests and the appropriateness of their reliance on a number of FOIA exemptions to withhold otherwise responsive records. Both sides now seek summary judgment. For the reasons explained further below, the Court will grant summary judgment to the agencies with two exceptions: it concludes that (1) the State Department's search for passports issued to one of the agents under two pseudonyms was unduly restrictive and (2) certain potentially responsive records in operational files that the CIA claimed were exempt from disclosure fall under an

exception to that exemption and, consequently, the CIA must either search the files for those records or explain why no responsive records are likely to be found there.

## I. Background

David Talbot is a journalist, author, and co-founder of the online newspaper Salon.com. Compl. ¶ 1. He has written multiple books covering the historical period of the presidency of John F. Kennedy, including the Kennedy assassination. Id. ¶¶ 1–3. In May 2013, in connection with research for a now-published book on former CIA Director Allen Dulles, Talbot submitted FOIA requests to the Department of State and the CIA. The request to the State Department sought "[a]ll passport and visa records pertaining to" two former CIA agents, William King Harvey and F. Mark Wyatt, from January 1, 1950 through July 1, 1976, as well as copies of all photographs of the two men. Id. Ex. 1. The request to the CIA also sought records related to Wyatt and Harvey, specifically "[a]ll records pertaining to temporary duty (TDY) travel," "[a]ll passport and visa records," "[a]ll records reflecting assignment to a[] station, post, base, unit or other component of the CIA," and "[a]ll photographs pertaining to" the two from January 1, 1950 to July 1, 1976 for Harvey and from January 1, 1948 to 1975 for Wyatt. Id. Ex. 6.

State and the CIA informed Talbot they had received his requests and began processing them. Id. ¶¶ 11, 20. When the agencies failed to fully process Talbot's requests, he brought suit against them in this Court. After production was completed, both parties filed motions for summary judgment, with Talbot challenging the agencies' searches and their withholdings. The Court held a hearing on the motions on May 15, 2018.

## II. Standard of Review

Summary judgment may be granted when the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a). Summary judgment is the typical mechanism to determine whether an agency has met its FOIA obligations. See, e.g., Judicial Watch, Inc. v. CFPB, 60 F. Supp. 3d 1, 6 (D.D.C. 2014).

Under FOIA, an agency is first required to make an adequate search for any responsive records. Rodriguez v. U.S. Dep't of Def., 236 F. Supp. 3d 26, 34 (D.D.C. 2017). In reviewing an agency's search, courts apply a "reasonableness" test that looks to the methods and not the fruits of a search. Id. To prove its search was reasonable, the agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency may rely on affidavits that detail "what records were searched, by whom, and through what process" to make this showing. Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994). Agency affidavits are "accorded a presumption of good faith." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

In addition to demonstrating that it conducted an adequate search, the agency must also justify any withholdings it has made pursuant to a FOIA exemption. See, e.g., Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009). Justification can be provided by sufficiently detailed agency affidavits. See, e.g., id. Because the primary purpose of FOIA is disclosure, exemptions are construed narrowly. See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

The agencies here have invoked three separate FOIA exemptions. First, the CIA has withheld some documents under Exemption 1, which protects from disclosure documents "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and that "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Second, the CIA has withheld documents under

Exemption 3, which covers certain records "specifically exempted from disclosure by statute." 5

U.S.C. § 552(b)(3). To demonstrate that records fall within Exemption 3, the agency must show

that "the statute claimed is one of exemption as contemplated by Exemption 3 and that the

withheld material falls within the statute." <u>Larson</u>, 565 F.3d at 865.

Finally, both the State Department and the CIA have redacted certain names and personal

information under Exemption 6, which covers "personnel and medical files and similar files the

disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5

U.S.C. § 552(b)(6). Courts follow a two-part test in applying Exemption 6. <u>See, e.g.</u>, <u>Multi Ag</u>

<u>Media LLC v. Dep't of Agriculture</u>, 515 F.3d 1224, 1228 (D.C. Cir. 2008). First, the Court

determines whether the information constitutes "personnel, medical, or 'similar' files covered by

Exemption 6." <u>Id.</u> Then, the Court determines whether disclosure would "'constitute a clearly

unwarranted invasion of personal privacy'" by "balanc[ing] the privacy interest that would be

compromised by disclosure against any public interest in the requested information." <u>Id.</u>

(quoting 5 U.S.C. § 552(b)(6)).

### III. Analysis

Talbot challenges nearly every aspect of the State Department's and the CIA's response

to his FOIA requests.[1] He first contends that neither agency performed an adequate search for

records. He next argues that both agencies' withholdings were improper. Finally, he argues that

the agencies have not met their obligations to segregate non-exempt material from the withheld

records. The Court will begin in Foggy Bottom before traveling to Langley.

---

[1] While Talbot's complaint even challenges the $31.70 fee charged by the CIA to process
the Harvey records, Compl. ¶¶ 37–38, he does not mention that fee in his briefing on summary
judgment.

A. The State Department's Search and Withholdings

Talbot challenges the State Department's search and production on several grounds: that (1) the Department's search for records responsive to his May 2013 request was inadequate, (2) its withholdings were improper, and (3) it failed to respond to a separate April 2016 request he submitted. While the Court will grant the Department summary judgment as to its withholdings, the April 2016 request, and its search for Agent Wyatt's records, it will deny both motions without prejudice as to the adequacy of the Department's search for passport records associated with Agent Harvey's two pseudonyms.

*1. Adequacy of the State Department's search*

The State Department's search for passport records for both Harvey and Wyatt is described in declarations submitted by Eric F. Stein, the Director of the Department's Office of Information Programs and Services. According to Mr. Stein, the Department determined that any responsive records were likely to be found in the Department's Office of Passport Services because that office handles the issuance of passports to U.S. citizens. Decl. of Eric F. Stein ¶¶ 14–15. Department personnel conducted a search of several electronic databases that typically contain records for more recent passports, but also include some imaged records for older passports. Id. ¶¶ 16–17, 20. These personnel searched for records listing Harvey's name and birthdate, Wyatt's name and birthdate, or two pseudonyms used by Harvey that Talbot provided and Harvey's actual birthdate. Id. ¶¶ 16–17, 20. Additionally, Department personnel searched the agency's archived hard copy passport files, again for passport records with Harvey's name and birthdate, Wyatt's name and birthdate, or Harvey's two pseudonyms and actual birthdate. Id. ¶¶ 18, 21. The Department found ten documents pertaining to Wyatt but none to Harvey. Id. ¶¶ 19, 22.

Talbot advances several arguments as to why this search was inadequate, all but one of which are unavailing. First, Talbot faults the Department for searching using only Harvey's and Wyatt's first and last names rather than their full names including their middle names. Mem. P. & A. Opp'n Defs.' Mot. Summ. J. & Supp. Pl.'s Mot. Summ. J. ("Pl.'s Cross-MSJ") at 12–13, 16. But Mr. Stein clarifies in a supplemental declaration that any results from the search using first and last names would necessarily include results associated with their full names. Suppl. Decl. of Eric F. Stein ¶¶ 5, 8.

Next, Talbot contends that the Department should have searched for records related to two specific passports, which other records produced by the Department indicated were used by Wyatt. Pl.'s Cross-MSJ at 18. In his supplemental declaration, however, Mr. Stein attests that the Department ran an additional search for any responsive records related to those two passports and found none. Suppl. Decl. of Eric F. Stein ¶¶ 10–12.

Third, Talbot contends that the search excluded theoretical locations where records could have been found. He speculates, for instance, that there must be some sort of "records system relating to passport services provided to CIA officers" that the Department neglected to search. Pl.'s Cross-MSJ at 14. Similarly, Talbot argues that the Department also needed to search "employment and personnel records relating to employees who receive 'special passports.'" Id. at 17. But as the Department notes, Talbot's request was for *passport and visa records* pertaining to Wyatt and Harvey, not for any records or even for any employment or personnel records. See Compl. Ex. 1. The Department does not typically create or maintain records on visas that Americans receive from foreign countries—those are housed with the foreign country authorizing the visa. Decl. of Eric F. Stein ¶ 14 n.1. As to passport records, the Department has explained why the locations searched—the electronic and paper records of the office responsible

for processing and issuing passports to U.S. citizens—were the logical places to find any responsive records.  Id. ¶¶ 14–15.

Talbot also contends that the search for Harvey's passport records was inadequate because the Department failed to find any responsive records—a result he argues "beggars belief" because Harvey "was a CIA officer serving in overseas posts in the 1950s and 1960s" and it is "well documented that he travelled extensively during that time."  Pl.'s Cross-MSJ at 14. But it is well-settled that the adequacy of a search "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).  Records, especially ones that are several decades old, "may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them."  Id.  The Department has attested that it searched the place most likely to contain passport records using reasonable terms, namely Harvey's name and birthdate.

Talbot's final argument fares better.  When the Department searched for passports issued under two pseudonyms that Harvey is known to have used, it limited its search to records containing those pseudonyms and Harvey's *actual* birthdate.  Decl. of Eric F. Stein ¶ 18.  It strikes the Court as unlikely that a CIA officer using a pseudonym would list his real birthdate with the false name rather than a false birthdate.  The Department's declarations offer nothing to support a contrary conclusion.  The Court therefore concludes that the Department's search for only records reflecting Harvey's actual birthdate was too narrow.  As a result, the search was not reasonably calculated to find all responsive records.  The Court will, accordingly, deny both motions without prejudice as to this aspect of the Department's search and will require a further search for records associated with Harvey's pseudonyms.

That said, the Court appreciates that there may be many passports issued to other individuals who share a name with Harvey's pseudonym, especially the pseudonym "William Walker," which the State Department would not be at liberty to produce. At the hearing, Talbot's counsel proposed several possible ways to limit the Department's search so as to exclude results that are not likely to be Harvey's passport records—namely, using a range of birthdates falling within five years of Harvey's actual birthdate (that is, two-and-a-half years on either side of his actual birthdate) and limiting the search to passport applications listing planned travel to Germany or Italy (where Talbot believes Harvey travelled during the relevant time period). Given these reasonable limitations, the Court will require the State Department to conduct another search with these parameters and to report back on whether the search yields any results. If it does, the Court will consider ways that it might determine whether the passport records are associated with Harvey and not someone else.

## 2. The State Department's withholdings

Next, Talbot challenges the State Department's decision to withhold certain information pursuant to Exemption 6. As explained by Johnathan Rolbin, the Director of Legal Affairs and Law Enforcement Liaison for the Department's Passport Services Directorate, the Department redacted from the disclosed records the names and signatures of Department employees and the names, birth dates, and places of birth of Wyatt's then-minor children. Decl. of Johnathan M. Rolbin ¶¶ 5, 9–12. As to the details regarding Wyatt's children, the Department concluded that the release of that information "would reveal private details of these individuals' lives, including when and how these individuals were documented as U.S. citizens" and "other biographical information in which these individuals have a privacy interest" but would "shed no light on the operations and activities of the U.S. government." Id. ¶ 9. For the Department employees, it

was felt that the release of the redacted information could "subject them (and their family members) to harassment, violence, or even improper civil judgments outside of the workplace." Id. ¶ 10; see also id. ¶¶ 11–12. For instance, Mr. Rolbin explains that "Department employees involved in passport adjudication process have been named personally in state court lawsuits seeking personal monetary civil judgments" and "have been subject to personal threats and harassing communications," even if the employees no longer work for the Department. Id. ¶ 10; see also id. ¶¶ 11–12.

As noted above, the Court applies a two-part test to determine the applicability of Exemption 6. See, e.g., Multi Ag Media, 515 F.3d at 1228. First, the Court determines whether the information sought to be withheld meets the requirements of "personnel, medical, or 'similar' files covered by Exemption 6." Id. Talbot argues that "[t]he redactions in issue in this case are neither medical nor personnel files nor are they files similar to medical or personnel files." Pl.'s Cross-MSJ at 25. But he is incorrect in light of the Supreme Court's decision in U.S. Department of State v. Washington Post Co., 456 U.S. 595 (1982), which held that Exemption 6 covers all "information which applies to a particular individual" no matter the type of file it is contained in, id. at 602. The information redacted here—specifically, the names and signatures of employees and the names, birth dates and places of birth of Wyatt's children, Decl. of Johnathan M. Rolbin ¶ 5—clearly applies to particular individuals.

Talbot next contends that the privacy harms identified by Mr. Rolbin are "secondary effects" that are insufficient to trigger Exemption 6. This argument also misses the mark. The D.C. Circuit has recognized that the "secondary effects" of a document's release do not qualify to trigger the applicability of Exemption 6. Arieff v. U.S. Dep't of Navy, 712 F.2d 1462, 1468 (D.C. Cir. 1983). But the types of harms addressed in Arieff are different; since the records at

issue there contained no information directly attributable to an individual, id. at 1466, any harm that flowed from their release was distinct from the type of harm that could "only occur when the documents disclose information attributable to an individual," id. at 1468. Here the redacted information is attributable to an individual and the harms that Mr. Rolbin identifies flow directly from the release of information attributable to that individual.

Additionally, Talbot suggests that the Department's redactions were inappropriate because it failed to verify that the individuals whose names were redacted were still alive (and deceased individuals lack a sufficient privacy interest to justify the application of Exemption 6 in this context). Pl.'s Cross-MSJ at 22. But in a supplemental declaration, Mr. Rolbin explains that the Department verified whether the individuals at issue were alive and released additional records for those it concluded were not. Suppl. Decl. of Johnathan M. Rolbin ¶ 4. It made these determinations using human resources files, the Social Security Death Matrix File, and a precautionary presumption that individuals born within 100 years are still alive. Id. The Department's approach as outlined in this supplemental declaration was adequate. See Schrecker v. U.S. Dep't of Justice, 349 F.3d 657, 663–65 (D.C. Cir. 2003) (holding that agency that relied on institutional knowledge of life status, searched the Social Security Death Index with individuals' social security number, and applied a similar 100-year rule adequately attempted to verify whether individuals were still living).

Finally, Talbot argues that even if the threshold requirements for Exemption 6 are met, the balance of privacy interests and public interests favors disclosure here. Pl.'s Cross-MSJ at 25–26; see Multi Ag Media, 515 F.3d at 1228 (the second step for determining the applicability of Exemption 6 is a balancing of the privacy and public interests). The Court disagrees. With respect to Wyatt's children, the disclosure of information regarding "private citizens" which

"'reveals little or nothing about an agency's own conduct' does not serve a relevant public interest under FOIA." Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs., 554 F.3d 1046, 1051 (D.C. Cir. 2009). The names, places of birth, and dates of birth of Wyatt's then-minor children—which is what the Department redacted, Decl. of Johnathan M. Rolbin ¶¶ 9, 11—sheds little if any light on the Department's own conduct. The privacy interests of Wyatt's children in their personal biographical information thus outweigh whatever public interest might exist in the disclosure of the information.

This leaves the redacted names and signatures of State Department employees who were involved in processing Wyatt's passports. See id. ¶¶ 10–12. The question is whether the "incremental value of the specific information being withheld"—the employees' names and signatures—would outweigh the employees' privacy interests. See Schrecker, 349 F.3d at 661. It would not. Mr. Rolbin points to several legitimate concerns the employees might have about the disclosure of their names, including the possibility of harassment and threats. Decl. of Johnathan M. Rolbin ¶¶ 10–12. These concerns exist even if the particular passport application decisions here are favorable: the release of the names and signatures provides a possible target for other members of the public who have received unfavorable decisions. While these concerns strike the Court as somewhat attenuated, Talbot points to little value that would be gained by knowing the specific civil servants involved in the processing of the passports beyond what was already disclosed by the released redacted records. The Court therefore concludes that the public interest here does not outweigh the privacy interest of the employees. The Department's redactions under Exemption 6 were proper.

### 3. *The April 2016 request*

Finally, Talbot argues that the Department failed to respond to a separate April 16, 2016 FOIA request that he submitted.  Pl.'s Cross-MSJ at 19.  The Department responds that it never received this request.  Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 17.  If an agency does not receive a FOIA request then it has no obligation to respond to it.  See, e.g., Kanaya v. Alcohol, Tobacco, Firearms & Explosives, 284 F. Supp. 3d 1, 2 (D.D.C. 2018).  An agency's affidavit attesting that it has no record of receiving the request will suffice to prevail on summary judgment unless the requester can present sufficient evidence to create a genuine factual question regarding the agency's receipt of the request.  See, e.g., id.; Pinson v. U.S. Dep't of Justice, 69 F. Supp. 3d 108, 114 (D.D.C. 2014).

Here, Mr. Rolbin attests that the Department searched its case tracking system and found no evidence that the April 2016 request was received.  Decl. of Johnathan M. Rolbin ¶¶ 13–15. The Department also checked the case file for Talbot's May 2013 FOIA request and consulted the paralegal who handled that request, and similarly found no indication that the April 2016 request was received.  Id. ¶ 16.  In turn, Talbot submits a responsive declaration from his attorney, Dan L. Hardway, attesting that he sent a FOIA request to the Department on April 16, 2016.  Decl. of Dan L. Hardway ¶ 4.  But as multiple judges in this District have recognized, the mere fact that a plaintiff alleges a request was *sent* does not indicate the request was *received*. See, e.g., Kanaya, 284 F. Supp. 3d at 2–3; Banks v. Lappin, 539 F. Supp. 2d 228, 235 (D.D.C. 2008).  Mr. Hardway attaches to his declaration U.S. Postal Service tracking information he claims is for the FOIA request that was sent, but this information does not indicate the address or recipient of the request.  See Decl. of Dan L. Hardway Ex. 5.  Moreover, the State Department notes that the package was shown delivered in Washington, D.C., but FOIA requests to the

Department are to be sent to Sterling, Virginia. Defs.' Reply at 18; <u>see also</u> 22 C.F.R. §171.4(a)(1) (directing that requests for passport records should be sent to a post office box in Sterling, Virginia). The Court finds that Talbot has failed to contradict the State Department's attestation that it never received his April 2016 request. <u>See, e.g.</u>, <u>Ning Ye v. Holder</u>, 624 F. Supp. 2d 121, 124 (D.D.C. 2009) (plaintiff's attestation that he mailed FOIA request and submission of tracking information that did not show the recipient's name or address failed to overcome agency declaration that it had no record of receiving plaintiff's request). Summary judgment is therefore appropriate for the State Department as to Talbot's claims regarding the April 2016 request.

B. <u>The CIA's Search and Withholdings</u>

In challenging the CIA's search and withholdings, Talbot contends that the agency: (1) performed an inadequate search; (2) erroneously concluded that its operational files were exempt from disclosure; (3) produced an inadequate *Vaughn* index; and (4) improperly withheld responsive documents under Exemptions 1, 3, and 6. The Court will grant the CIA summary judgment on each aspect of its search and production except for its failure to search its operational files. As to that issue, the Court concludes that a subset of potentially responsive records contained in operational files were not categorically exempt and the CIA must either search its operational files for those records or explain why no such responsive records would be found there.

*1. Adequacy of the CIA's search*

Beginning with the adequacy of the CIA's search for records, Antoinette B. Shiner, the Information Review Officer at the CIA's Litigation Information Review Office, submitted a declaration on behalf of the agency outlining its search for records. According to Ms. Shiner, the

13

CIA determined that the Official Personnel File ("OPF") for Harvey and Wyatt were likely to contain any responsive records, since such files "contain[], among other things, work-related travel records (TDY records) and records pertaining to the assignment and reassignment of officers throughout their career at the CIA." Decl. of Antoinette B. Shiner ¶¶ 21, 23. CIA personnel conducted a search for Wyatt's and Harvey's personnel files—a supplemental declaration from Ms. Shiner explains this was done by using each agent's name and Agency Identification Number, a unique identifier provided to each CIA employee during their employment. Suppl. Decl. of Antoinette B. Shiner ¶¶ 7–8. While Harvey's file was located and processed, the CIA was unable to locate Wyatt's file. Decl. of Antoinette B. Shiner ¶¶ 22, 23. The search indicated that Wyatt's archived file was requested by staff from the Office of Human Resources, was never returned to the records center, and could not be located by the Office of Human Resources in its own files after two searches. Id. ¶ 22; see also Suppl. Decl. of Antoinette B. Shiner ¶ 7 (describing additional search for Wyatt's file).

Aside from a challenge to the CIA's failure to search operational files, which the Court will address separately below, Talbot primarily contends that the CIA's search was inadequate because it overlooked indications that responsive records could be found in other locations. Pl.'s Cross-MSJ at 33–34. He points to specific documents suggesting an assortment of other offices—such as the agency's Office of Personnel Security—that might have other responsive records. But the CIA is obligated to search where records are most likely to be housed *today*. As Ms. Shiner explains, in the fifty plus years that have passed since the operative dates of Talbot's request, the CIA has "undergone numerous internal reorganizations" involving "the creation of new divisions and components and the closure or merging of other divisions and components, as well as a corresponding reshuffling of responsibilities among the various

divisions within CIA." Suppl. Decl. of Antoinette B. Shiner ¶ 10. Some of the divisions that might have housed records in the 1950s and 1960s no longer do so or may even no longer exist. Id. Moreover, Ms. Shiner has explained that given the age of the records, any existing records would not be digitized. Id. These are adequate explanations for why the agency concluded that the hard copies of Harvey's and Wyatt's personnel files were the most likely *current* repository for any existing responsive records. See Decl. of Antoinette B. Shiner ¶¶ 21, 23; Suppl. Decl. of Antoinette B. Shiner ¶ 5.

Talbot also argues the search was inadequate because the CIA was unable to find the missing Wyatt personnel file and failed to detail the steps it took to locate it. Pl.'s Reply Defs.' Opp'n ("Pl.'s Reply") at 8. However, the declarations provided by Ms. Shiner attest that the CIA division that houses the personnel files contacted the Office of Human Resources, which conducted a search for Wyatt's personnel file in December 2015 and again in June 2017. Decl. of Antoinette B. Shiner ¶ 22; Suppl. Decl. of Antoinette B. Shiner ¶ 7. Human Resources searched its own files and had the individual who requested Wyatt's file search as well. Suppl. Decl. of Antoinette B. Shiner ¶ 7. Neither Human Resources nor the requestor nor the division that houses the personnel files could locate Wyatt's file—and given its age, no digitization of the file exists. Id.; Decl. of Antoinette B. Shiner ¶ 22. Shiner's declarations sufficiently detail the steps taken to find Wyatt's missing file and are afforded a presumption of good faith. See, e.g., SafeCard Servs., 926 F.2d at 1200. Talbot offers no basis to discredit the declarations. The Court therefore concludes that the CIA conducted a reasonable search for Wyatt's file notwithstanding its failure to locate it. In sum, setting aside the CIA's failure to search operational files, to which the Court will now turn, the Court concludes that the CIA conducted an adequate search for responsive records.

## 2. *Search of the CIA's operational files*

Talbot also argues the CIA's search was inadequate because the agency did not look for any responsive records within its operational files. Pl.'s Cross-MSJ at 29–31. The CIA responds that operational files—and thus any responsive records contained therein—are categorically exempt from FOIA under the CIA Information Act, 50 U.S.C. § 3141. Defs.' Reply at 5. That statute defines "operational files" as files that "document the conduct of foreign intelligence or counterintelligence operations or intelligence or security liaison arrangements or information exchanges with foreign governments or their intelligence or security services," 50 U.S.C. § 3141(b)(1), and generally exempts them from disclosure under FOIA, id. § 3141(a); see also Morley v. CIA, 508 F.3d 1108, 1116 (D.C. Cir. 2007). There is an exception, however: the statute goes on to provide that operational files may still be searched for responsive records that are "the specific subject matter of an investigation by the congressional intelligence committees" or other specifically enumerated investigative offices conducted into "any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity." 50 U.S.C. § 3141(c)(3).[2]

The D.C. Circuit has laid out a three part test to determine if requested records fall under this congressional-investigation exception to the CIA Information Act's protection. See, e.g., Morley, 508 F.3d at 1116. First, the entity that performed the investigation must qualify as a "congressional intelligence committee" or be one of the other listed entities in the statute. Id. Second, the request must concern "the specific subject matter" of the investigation. Id. at 1117

---

[2] The specifically enumerated offices are: the Intelligence Oversight Board, the Department of Justice, the Office of the General Counsel of the CIA, the Office of Inspector General of the CIA, and the Office of the Director of National Intelligence. 50 U.S.C. § 3141(c)(3).

(quoting 50 U.S.C. § 3141(c)).  This requirement is satisfied when the investigating entity "would have deemed the records at issue to be central to its inquiry."  <u>Id.</u> at 1118.  Finally, the investigation must be one into an "impropriety or violation of law, Executive order, or Presidential directive, in the conduct of an intelligence activity."  <u>Id.</u> (quoting 50 U.S.C. § 3141(c)).  Such an investigation need not involve misconduct that amounts to illegal behavior. <u>Id.</u>

Talbot argues that the records he requests fall under this exemption because they concern the subject of multiple investigations, namely the Senate Select Committee of Intelligence (the "Church Committee") investigation into plots to overthrow or assassinate Fidel Castro; a CIA Inspector General investigation into the Castro assassination plot; the Warren Commission investigation into President Kennedy's assassination; and the House Select Committee on Assassinations ("HSCA") investigation into the Kennedy assassination.  Pl.'s Cross-MSJ at 30–32.

Starting with the Church Committee, the D.C. Circuit has already held that it meets the first requirement—that it is a "congressional intelligence committee"—and that its inquiry into the CIA's efforts to assassinate Fidel Castro meets the third requirement—that it is an investigation into impropriety or violation of law in the conduct of an intelligence activity. <u>Morely</u>, 508 F.3d at 1117, 1119.  What remains, then, is whether the requested records meet the second requirement: whether the Church Committee "would have deemed the records at issue to be central to its inquiry."  <u>Id.</u> at 1118.

As to a subset of the requested records, the answer is yes.  In 1975, William Harvey testified as a witness before the Church Committee regarding his role from November 1961 to March 1963 in a covert operation directed at overthrowing the Castro regime dubbed "Operation

Mongoose" and a related plan to assassinate Castro. *Hearing Before the S. Select Comm. to Study Gov't Operations with Respect to Intelligence Activities*, 94th Cong. 86:21, 105:3–13, 107:20–24, 140:23–24 (1976) (testimony of William K. Harvey). The Committee released an interim report specifically addressing several CIA planned assassinations, including that of Castro, which discussed Harvey, his testimony, and his role in those operations. See, e.g., *Alleged Assassination Plots Involving Foreign Leaders*, S. Rep. No. 94-465, at 164–65 (1975).

Given the Church Committee's interest in Harvey, it seems clear that it would have considered records reflecting his TDY travel and station or base assignments (both subjects of Talbot's request, see Compl. Ex. 6) with respect to the specific operations at issue central to its investigation. Indeed, the Committee asked Harvey about his travel at the hearing, *Hearing Before the S. Select Comm. to Study Gov't Operations with Respect to Intelligence Activities*, 94th Cong. 63:11–13, 66:11–13 (1976) (testimony of William K. Harvey), and discussed trips he took for meetings in the interim report it released, *Alleged Assassination Plots Involving Foreign Leaders*, S. Rep. No. 94-465, at 83–84 (1975). Thus, the second requirement of the D.C. Circuit's three-part test is also met. The Court therefore concludes that a specific, narrow subset of the possible requested records in operational files—those that would relate to Operation Mongoose or the Castro assassination plots, during the time period of November 1961 to June 1963—fall within the exception in 50 U.S.C. § 3141(c) and are not categorically exempt from FOIA.

The other investigations that Talbot points to do not meet the requirements in 50 U.S.C. § 3141(c) and thus records associated with those operations remain exempt. For one, the D.C. Circuit has indicated that the House Select Committee on Assassinations does not meet the definition of a congressional intelligence committee. Morley, 508 F.3d at 1117. As to the

Warren Commission, while Harvey may have been mentioned in witness testimony before the Commission, he was not a witness himself and his name does not seem to appear once in the Commission's 900-page final report. This relative dearth of discussion about Harvey indicates that any records concerning him were incidental rather than central to the investigation. These additional investigations that Talbot points to thus do not suffice to place any further requested records within the scope of 50 U.S.C. § 3141(c).[3]

To conclude: because Harvey's activities and involvement with Operation Mongoose and the Castro assassination plots in 1961 to 1963 were central to the Church Committee investigation, any responsive records related to those operations contained in the agency's operational files fall within 50 U.S.C. § 3141(c) and the CIA must search those files to the extent necessary to conduct an adequate search. However, other records located within operational files remain exempt.

The Shiner Declarations suggest that the CIA has not considered whether any responsive records would even be found in the operational files discussed above because it believed all records in operational files were exempt wholesale. See, e.g., Decl. of Antoinette B. Shiner ¶ 24 ("The decision to task HR and focus the search on Harvey and Wyatt's OPFs was informed by CIA's knowledge of specific databases and/or files—other than operational files of the CIA which are exempt from the search, review, publication, and disclosure requirements of the FOIA . . ."); Suppl. Decl. of Antoinette B. Shiner ¶ 8 ("Again, based on the CIA's knowledge of specific databases and/or files, excluding exempt operational files, the CIA determined that the

_____

[3] Since the Inspector General of the CIA's investigation into the Castro assassination plot concerns the same topic as the Church Committee investigation, the Court need not address whether that investigation provides a separate basis to conclude that the requested records fall under 50 U.S.C. § 3141(c).

OPF files were the most likely repository of the information Plaintiff sought.").  Consequently,

the Court will require the CIA to either search the operational files for the specific universe of

non-exempt records—those responsive records related to Operation Mongoose or the Castro

assassination during the period of November 1961 to June 1963—or provide an explanation for

why it need not do so to perform an adequate search.[4]

### 3. Sufficiency of the Vaughn index

Next, Talbot challenges the sufficiency of the CIA's *Vaughn* index.  Pl.'s Cross-MSJ at

34–35; see Decl. of Antoinette B. Shiner Ex. L (*Vaughn* index).  In analyzing a *Vaughn* index's

sufficiency, the Court's "focus is on the functions served by the *Vaughn* index: to organize the

withheld documents in a way that facilitates litigant challenges and court review of the agency's

withholdings."  Judicial Watch, Inc. v. FDA, 449 F.3d 141, 148 (D.C. Cir. 2006).  Thus, the

*Vaughn* index must "adequately describe each withheld document or deletion from a released

document" and must "state the exemption claimed for each deletion or withheld document, and

explain why the exemption is relevant."  People for the Am. Way Found. v. Nat'l Park Serv., 503

F. Supp. 2d 284, 294 (D.D.C. 2007) (citation omitted).  An agency is allowed to use a *Vaughn*

index in conjunction with agency declarations that more fully detail the basis for the claimed

exemptions.  Judicial Watch, 449 F.3d at 148.

Here, the *Vaughn* index includes an entry for every withheld or redacted document, and

each entry provides the nature of the document (*e.g.*, "[m]emorandum regarding reimbursement

---

[4] Counsel for Talbot at the hearing argued that the CIA had not established that the alleged operational files met the requirement to be operational files.  But Talbot did not raise this argument in his briefing—in fact, the case he cited at the hearing, Judicial Watch v. CIA, 2018 WL 1885665 (D.D.C. April 18, 2018), was decided after the briefing was complete and Talbot filed no notice of supplemental authority.  As such, the argument was forfeited and the Court will not address it.

of expenses" or "[p]ayroll change notice"); the exemption(s) claimed; and a description of the type of information redacted, either by listing the specific information withheld (*e.g.*, "names" or "identifying information") or referencing a category of information described in the Shiner Declarations (*e.g.*, "cover" or "coding information"). The Shiner Declarations, in turn, explain why these specific categories of information meet the claimed exemption's requirements for withholding. See Decl. of Antoinette B. Shiner ¶¶ 29–33. Finally, the Court is mindful that many of the redactions involved here relate to intelligence sources and methods, and requiring more thorough explanations—such as a description of which sources and methods are being protected, see Pl.'s Cross-MSJ at 39 (faulting the CIA for "provid[ing] no information in regard to what sources and methods are sought to be protected")—could risk incurring the harm that the FOIA exemptions are designed to avoid. For all these reasons, the Court finds that the CIA's *Vaughn* index is sufficient to fulfill its purposes.

### 4. *The CIA's withholdings*

Finally, Talbot challenges the CIA's withholdings. The CIA asserted withholdings, some in part and some in full, under three FOIA exemptions: Exemption 1 (for classified information), Exemption 3 (for records exempt from disclosure by statute), and Exemption 6 (for personal information). The Court concludes that the CIA's withholdings were proper.

### a. Exemption 3

The CIA withheld several documents in part or in full under Exemption 3, which applies to records exempted from release under FOIA by another statute, see 5 U.S.C. § 552(b)(3). The CIA bases its withholdings on two specific statutes: the Central Intelligence Agency Act ("CIA Act") and the National Security Act. The CIA Act prevents the disclosure of "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50

U.S.C. § 3507.  The National Security Act broadly directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  Both statutes have been recognized as valid Exemption 3 statutes.  See DiBacco v. U.S. Dep't of the Army, 234 F. Supp. 3d 255, 275 (D.D.C. 2017) (CIA Act); CIA v. Simms, 471 U.S. 159, 168 (1985) (National Security Act).

The Court will start with the withholdings under the CIA Act.  In her declaration, Ms. Shiner states that the agency withheld the "names, titles, identification numbers, and information pertaining to the organization (such as office titles) of CIA personnel" under Exemption 3, since such information falls under the CIA Act and its release could subject former intelligence officers and their families to "intimidation or possible physical harm."  Decl. of Antoinette B. Shiner ¶ 38.

Talbot first challenges these withholdings on the ground that the records are not "personnel documents," Pl.'s Cross-MSJ at 39, or "personnel information," Pl.'s Reply at 14. This argument is unavailing.  The statute specifically protects the disclosure of "names, official titles, [and] salaries."  50 U.S.C. § 3507.  A perusal of the CIA's *Vaughn* index shows this is precisely the type of information it withheld.  See, e.g., Decl. of Antoinette B. Shiner Ex. L (*Vaughn* index) entry 6 (redacted names of CIA personnel); id. entry 52 (redacted names of personnel and employee ID numbers); id. entry 79 (redacted identifying information of CIA personnel).  That such information may not be in a "personnel document" is irrelevant:  the statute nowhere says it applies only to names, titles, and salaries in personnel documents.  See, e.g., DiBacco, 234 F. Supp. 3d at 277.

Talbot also contends that the CIA Act does not apply to former or deceased employees. Pl.'s Reply at 14.  But he cites no authority for this proposition, and the statutory text is to the

22

contrary. It protects the names and titles of personnel "*employed by* the Agency." 50 U.S.C. § 3507 (emphasis added). A former or deceased employee was still employed by the CIA. Thus, as other judges in this District have concluded, the plain text of the statute encompasses names and other information for former or deceased employees. See, e.g., DiBacco, 234 F. Supp. 3d at 277; Hall v. CIA, 881 F. Supp. 2d 38, 66 (D.D.C. 2012). And clearly, the kind of harm that can flow from the disclosure of such information—exposing CIA personnel and their families to "intimidation or physical harm," Decl. of Antoinette B. Shiner ¶ 38—is just as capable of occurring to former or deceased employees and their families as to current employees and their families. The CIA has thus justified the withholdings it made under the CIA Act.

Second, the CIA made a series of withholdings pursuant to Exemption 3 in reliance on the National Security Act.[5] Ms. Shiner's declaration attests that the CIA withheld information that "concerns intelligence sources and methods." Id. ¶¶ 36–37. It further details the categories of withheld information contained in the records—foreign liaison services, locations of and assignments to permanent overseas field installations, the use of cover and cover methods, and coding information[6]—and the harms to national security that would flow from disclosure of such information, including damage to the U.S. government's relationship with foreign intelligence partners, and disclosure of the location of clandestine CIA bases and the agency's intelligence methods. Id. ¶¶ 28–34.

---

[5] All of the CIA's Exemption 1 withholdings were also made under Exemption 3 in reliance on the National Security Act. See Decl. of Antoinette B. Shiner Ex. L (*Vaughn* index). Since the Court concludes that those withholdings were proper under Exemption 3, it need not address Exemption 1's applicability.

[6] Coding information is "information that, if connected to other information or placed in the proper context, could reveal the presence of an overseas field installation or the fact that the CIA utilizes a particular cover mechanism." Decl. of Antoinette B. Shiner ¶ 33.

Talbot's main challenge to the Exemption 3 withholdings is that the text of the National Security Act only prohibits *unauthorized* disclosures and the CIA has not demonstrated that disclosure here would be unauthorized. Pl.'s Cross-MSJ at 39. Talbot notes that much of the relevant information is likely no longer classified because of automatic-declassification provisions for records more than 25 or 50 years old. Id.; see also Pl.'s Reply at 13. "If information has been declassified," he argues, "its disclosure is no longer unauthorized." Pl.'s Reply at 13.

This argument is unavailing. Talbot cites no authority for the proposition that simply because information is not classified, *any* disclosure of that information pursuant to a FOIA request is authorized. This is not surprising. For one, the mere fact that information is not classified does not mean that disclosure of that information is automatically authorized. For another, Talbot's argument would vitiate the scope of the National Security Act's protection under Exemption 3: if the disclosure of unclassified information pursuant to a valid FOIA request is necessarily authorized, then any protection accorded by the National Security Act under Exemption 3 would be co-extensive with Exemption 1's protection for classified information.

Finally—and most importantly—the statutory text does not comport with Talbot's interpretation that declassification automatically makes any disclosure authorized. As the Supreme Court has recognized, "Congress [did not] state that only confidential or nonpublic intelligence sources are protected. [The statute] contains no such limiting language." Sims, 471 U.S. at 169; see also Fitzgibbon v. CIA, 911 F.2d 755, 762 (D.C. Cir. 1990) ("[T]he fact that the District Court at one point concluded that certain contacts between CIA and the foreign officials were 'nonsensitive' does not help Fitzgibbon because apparently innocuous information can be

protected and withheld."). Ultimately, the question the Court confronts here is whether the information at issue would disclose intelligence methods and sources. See, e.g., Larson v. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009) (the inquiry under Exemption 3 for the National Security Act is "whether the withheld material relates to intelligence sources and methods."). Ms. Shiner's declarations adequately attest that it would. See Decl. of Antoinette B. Shiner ¶¶ 28–33, 37; Suppl. Decl. of Antoinette B. Shiner ¶¶ 16–17.

### b. Exemption 6

In addition to the withholdings under Exemption 3, Talbot challenges the withholdings the CIA made under Exemption 6. According to Ms. Shiner, the CIA withheld the "names and personally identifiable information of CIA officers and other individuals found in the responsive records" under Exemption 6. Decl. of Antoinette B. Shiner ¶ 39. She explains that "the release of names and other identifying information would be reasonably likely to subject individuals or those associated with them to increased harassment or threats." Id. Talbot makes the same arguments as to these withholdings as he does to the State Department's Exemption 6 withholdings. See Pl.'s Cross-MSJ at 40. For the reasons discussed above as to the State Department's Exemption 6 withholdings, the Court concludes these withholdings were proper.

### C. Segregability

Finally, Talbot challenges the agencies' compliance with the requirement to release any "reasonably segregable portion of a record," 5 U.S.C. § 552(b)(9). Pl.'s Cross-MSJ at 40–42. "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007). Ms. Shiner attests that the CIA conducted a segregability review and released all reasonably segregable records. Decl. of Antoinette B. Shiner ¶ 40. Mr. Rolbin similarly attests

that the State Department released all reasonably segregable information.  Decl. of Johnathan M. Rolbin ¶¶ 9–12.  The burden is on Talbot to proffer contrary evidence to rebut the applicable presumption.  <u>See</u> <u>Sussman</u>, 494 F.3d at 1117 (discussing standards to rebut this presumption). He has not done so, and, consequently, his challenge to the CIA's response on this basis fails.

* * *

For the foregoing reasons, the Court will grant in part and deny in part the agencies' motion for summary judgment and deny Talbot's cross-motion.  It will grant the agencies summary judgment except as to the State Department's search for passport records under Harvey's pseudonyms and the CIA's search of the operational files.  On these two points, the Court will deny both motions without prejudice and require the State Department to conduct a supplemental search and the CIA to either do the same or justify why no such search is needed. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  June 7, 2018