**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **DAVID TALBOT**, |
| |
| Plaintiff, |
| |
| v. |
| |
| **U.S. DEPARTMENT OF STATE,** *et al.*, |
| |
| Defendants. |

Case No. 17-cv-588 (CRC)

## MEMORANDUM OPINION

Investigative journalist David Talbot is convinced that the Central Intelligence Agency had a hand in the assassination of President Kennedy. Seeking proof, Talbot filed Freedom of Information Act ("FOIA") requests with the CIA and State Department for the passport and travel records of two deceased CIA agents who Talbot suspects were aware of the agency's involvement. When the agencies' responses disappointed him, Talbot sued to challenge the adequacy of their searches and the legitimacy of their withholdings.

The parties have already undergone one round of summary judgment. In June, the Court dismissed most of Talbot's complaints but found in his favor on two points: that the State Department's search for one of the agent's records was unreasonably constrained by the use of his actual birthdate, and that the CIA had improperly refused to search its operational files for records. The agencies have since conducted a supplemental search and now renew their motion for summary judgment. Talbot opposes their motion and also seeks reconsideration of the Court's earlier decision rejecting his other arguments. For the reasons that follow, the Court will grant summary judgment to the agencies and deny Talbot's motion for reconsideration.

## I.    Background

David Talbot is a journalist, author, and co-founder of the online newspaper Salon.com. Compl. ¶ 1.[1]  He has written multiple books covering the historical period of the presidency of John F. Kennedy, including the Kennedy assassination.  Id. ¶¶ 1–3.  In May 2013, in connection with research for a now-published book on former CIA Director Allen Dulles, Talbot submitted FOIA requests to the Department of State and the CIA.  The request to the State Department sought "[a]ll passport and visa records pertaining to" two former CIA agents, William King Harvey and F. Mark Wyatt, from January 1, 1950 through July 1, 1976, as well as copies of all photographs of the two men.  Id. Ex. 1.  The request to the CIA also sought records related to Wyatt and Harvey, specifically "[a]ll records pertaining to temporary duty (TDY) travel," "[a]ll passport and visa records," "[a]ll records reflecting assignment to a[] station, post, base, unit or other component of the CIA," and "[a]ll photographs pertaining to" the two from January 1, 1950 to July 1, 1976 for Harvey and from January 1, 1948 to 1975 for Wyatt.  Id. Ex. 6.

Both agencies informed Talbot they had received his requests and began processing them.  Id. ¶¶ 11, 20.  When the agencies failed to fully process Talbot's requests, he brought suit against them in this Court.  After production was completed, the parties filed motions for summary judgment, with Talbot challenging the agencies' searches and their withholdings.  The Court held a hearing on the motions in May 2018.

The Court issued a split decision, granting in part and denying in part the agencies' motion and denying Talbot's.  Talbot v. U.S. Dep't of State, 315 F. Supp. 3d 355, 374 (D.D.C.

---

[1] Much of this factual background is drawn for the Court's previous summary judgment decision.  Talbot v. U.S. Dep't of State, 315 F. Supp. 3d 355 (D.D.C. 2018).

2018).  Although the Court formally denied Talbot's motion without prejudice, it did order both

the State Department and the CIA to conduct supplemental searches.  Id.  State had to take

another look for passport records under Harvey's pseudonyms, and the CIA had to canvas an

additional location—its operational files—for the requested records.  Id.

The agencies now say they have completed the Court-ordered searches and have given

Talbot all responsive documents.  They therefore renew their motion for summary judgment.

Talbot not only opposes defendants' renewed motion, but also asks the Court to revisit portions

of its earlier summary judgment decision.

## II.    Legal Standards

### A.  Reconsideration

When a court issues an "order or other decision . . . that adjudicates fewer than all the

claims or the rights and liabilities of fewer than all the parties," such order or decision "may be

revised at any time before" the case has been fully and finally resolved.  Fed R. Civ. P. 54(b).

While the "actual language of Rule 54(b) sets forth little guidance as to when such review is

appropriate," "courts in this district have held that 'relief upon reconsideration pursuant to Rule

54(b) is available 'as justice requires.'"  DL v. District of Columbia, 274 F.R.D. 320, 324

(D.D.C. 2011) (quoting Hoffman v. District of Columbia, 681 F. Supp. 2d 86, 90 (D.D.C.

2010)).  "[A]sking 'what justice requires' amounts to determining, within the Court's discretion,

whether reconsideration is necessary under the relevant circumstances."  Cobell v. Norton, 355

F. Supp. 2d 531, 539 (D.D.C. 2005).  Revision may be necessary "when the Court has 'patently

misunderstood a party, has made a decision outside the adversarial issues presented to the Court

by the parties, has made an error not of reasoning but of apprehension, or where a controlling or

significant change in the law or facts [has occurred] since the submission of the issue to the

Court." Singh v. George Washington Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005)

(quoting Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004)) (alteration in original).

      B.  Summary Judgment

FOIA cases are typically resolved on summary judgment. See Brayton v. Office of U.S.

Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is appropriately granted if

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).

Under FOIA, an agency is first required to make an adequate search for any responsive

records. Rodriguez v. U.S. Dep't of Def., 236 F. Supp. 3d 26, 34 (D.D.C. 2017). When a FOIA

requester challenges the adequacy of the agency's search, the agency must show "beyond

material doubt that its search was reasonably calculated to uncover all relevant documents."

Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011)

(quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999)) (quotation

omitted). In reviewing an agency's search, courts apply a "reasonableness" test that looks to the

methods and not the fruits of a search. Rodriguez, 236 F. Supp. 3d at 34. An agency "must

show that it made a good faith effort to conduct a search for the requested records, using methods

which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't

of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). To make this showing, the agency may rely on

affidavits that detail "what records were searched, by whom, and through what process."

Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994). Agency affidavits are

"accorded a presumption of good faith" and "cannot be rebutted by purely speculative claims

about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926

F.2d 1197, 1200 (D.C. Cir. 1991) (quotation omitted).

In addition to demonstrating that it conducted an adequate search, the agency must also justify any withholdings it has made pursuant to a FOIA exemption.  See, e.g., Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009).  An agency may justify its withholdings through sufficiently detailed affidavits.  See, e.g., id.  But because the primary purpose of FOIA is disclosure, courts construe exemptions narrowly.  See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

## III.  Analysis

### A.  Motion for Reconsideration

Talbot asks the Court to revisit six portions of its previous summary judgment decision. Because Talbot's arguments require the Court to retread ground already covered in the first summary judgment decision, the reader seeking additional context for these six disputes should refer to that ruling.  Talbot, 315 F. Supp. 3d 355.

#### 1.  Specificity of CIA's Additional Search

The first time around, the Court agreed with Talbot that the CIA needed to search its operational files for records regarding Agent Harvey's involvement in "Operation Mongoose" (a purported covert operation aimed at overthrowing the regime of Cuban dictator Fidel Castro) and a related plot to assassinate Castro.  Talbot contends, however, that the Court's order was "ambiguous" because it did not specify which particular operational files should be searched. Mot. for Reconsideration at 3.  The CIA responds that the additional search it conducted pursuant to the Court's order would have encompassed the particular files Talbot names in his proposed revised order.  Defs' Second Mot. Summ. J. at 2 (citing Ex. 3, Third Declaration of Antoinette Shiner ("Shiner Decl.") ¶ 4 n.1.  Finding no reason to doubt the CIA on this point, Talbot's first argument appears moot, and accordingly the Court rejects it.

*2. Whether Talbot Forfeited an Argument*

Talbot next asks the Court to reconsider its refusal to consider Talbot's argument that the CIA failed to establish that the alleged operational files fit the statutory definition for operational files. Mot. for Reconsideration at 4. But as the Court explained in its first summary judgment decision, Talbot did not develop this particular argument in his briefing and therefore forfeited it. Talbot, 315 F. Supp. 3d at 371 n.4. The portions of Talbot's briefs that he alleges did raise the argument did not in fact do so. To the contrary, in those parts of his briefs, Talbot argued that the CIA needed to search for files that would not be considered operational and that therefore might be housed in different subdivisions of the agency. See Pl's Opp'n to Defs' First Mot. Summ. J. at 28-29; Pl's Reply Supporting Cross Mot. Summ. J. at 10-1. In other words, Talbot's briefing complained about the *locations* the agency searched, which is distinct from the (belatedly raised) argument that the agency failed to properly verify that certain records qualified as operational. Accordingly, the Court stands by its initial conclusion: the argument that the CIA did not adequately verify the alleged operational files was forfeited.

*3. Security Certifications and Passport Records*

Talbot's third complaint is that the State Department and CIA failed to search for "security certificates" or "security certifications" involved in the processing of passports for CIA agents operating under State Department diplomatic cover. Pl's Mot. for Reconsideration at 6. But as the Court noted in its first summary judgment decision, Talbot's FOIA request sought "[a]ll passport and visa records" pertaining to Harvey and Wyatt; it did not seek employment or personnel records—whether those be the "security clearances" Talbot said he was entitled to in the first round of summary judgment briefing, Pl's First Mot. Summ. J. at 14, or the "security certifications" he now demands. And though Talbot contends these certifications were so

integral to the passporting process for CIA operatives that the agencies should have searched for them pursuant to his request for "passport and visa records," he has not offered the Court any reason to believe that the agency deliberately avoided searching for those certifications despite knowing they were responsive to Talbot's request. The Court therefore rejects Talbot's third argument for reconsideration.

### 4. *Unclassified Information and Exemption 3*

Talbot argues once again that information that has been declassified is also authorized for disclosure under the National Security Act and thus not properly withheld pursuant to FOIA Exemption 3. The Court previously rejected this argument, noting that it would nullify the National Security Act's Exemption 3 protection: "if the disclosure of unclassified information pursuant to a valid FOIA request is necessarily authorized, then any protection accorded by the National Security Act under Exemption 3 would be co-extensive with Exemption 1's protection for classified information." Talbot, 315 F. Supp. 3d at 373. Talbot offers no rebuttal, but urges reconsideration on the ground that the Court misconstrued and misapplied CIA v. Sims, 471 U.S. 159 (1985). Pl's Mot. for Reconsideration at 8-10. The Court did no such thing. It cited Sims for the proposition that the National Security Act has expansive protection under Exemption 3, and Sims stands for exactly this point: "The 'plain meaning' of § 102(d)(3) [of the National Security Act] may not be squared with any limiting definition that goes beyond the requirement that the information fall within the Agency's mandate to conduct foreign intelligence." Sims, 471 U.S. at 169. Whether that information is "confidential or nonpublic" does not determine whether it can be properly withheld under the National Security Act, despite Talbot's contention to the contrary. Id. Thus, Talbot's fourth argument for reconsideration fails.

## 5. *Employee Names and Exemption 6*

Talbot next argues that the agencies improperly redacted employee names and identifying information. He is incorrect. As for the CIA, Talbot disputes that such information can be withheld under Exemption 6, but he appears not to challenge the Court's conclusion that the same withholdings are proper under Exemption 3 and the CIA Act, 50 U.S.C. § 3507. Talbot, 315 F. Supp. 3d at 372-73. Accordingly, even if the Court were persuaded by Talbot's Exemption 6 arguments with respect to the CIA, that would not compel it to reverse its holding that the CIA properly redacted the names of its employees pursuant to Exemption 3.

Talbot's argument with respect to the State Department fares no better. Whether a withholding under Exemption 6 is proper turns on the balance between "the privacy interest that would be compromised by disclosure" and "any public interest in the requested information." Multi Ag Media LLC v. Dep't of Agric., 515 F.3d 1224, 1228 (D.C. Cir. 2008). While the Court acknowledged that the safety fears cited by the State Department were "somewhat attenuated," the Court remains unpersuaded by Talbot's argument that knowing the names of State Department personnel would serve some important public interest. Talbot insists that knowing such information might help him shed more light on how the "government operates in regard to providing cover to spies working overseas." Pl's Mot. for Reconsideration at 15. But the declaration Talbot cites in support of this point does not in fact establish that knowing the names of State Department employees who process passport applications will lead to any such information. See Declaration of William Simpich, ECF No. 18-3. The declaration instead states that the discovery of the name of the CIA's "Chief of the Central Cover Staff" led to the discovery of a "CIA Security File" that revealed information about the CIA's use of "commercial cover." Id. ¶ 7. At most, that statement provides a rationale for disclosing CIA personnel

information; it has nothing to do with State department personnel who process passport applications. Consequently, the Court rejects Talbot's fifth argument for reconsideration.

### 6. Segregability

In his final criticism of the Court's summary judgment decision, Talbot contends the Court got it wrong on segregability. He first says the Court erred by invoking the presumption that the agencies complied with their obligation to disclose reasonably segregable material. Pl's Mot. for Reconsideration at 15-16. But that presumption is a product of binding D.C. Circuit precedent, Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007), and the Court did not err by hewing to controlling precedent. Talbot next argues that the agencies' Vaughn indexes provided insufficient explanations for why certain parts of segregable documents were withheld. Pl's Mot. for Reconsideration at 16-17. Talbot's only support for this claim is that the Vaughn index in another case was more detailed than that produced here. Id. (citing Hall v. CIA, 881 F. Supp. 2d 38 (D.D.C. 2012)). As the agencies point out in response, however, Hall upheld the index at issue there as sufficient—and it is specious to assume that what was *sufficient* in one case (Hall) is *necessary* in every other case. So while Talbot is correct that the Vaughn indexes here were less detailed than in Hall, that does not mean the agencies failed to adequately justify their withholdings.

\*     \*     \*

The Court rejects Talbot's motion for reconsideration in its entirety. In the end, all six of his arguments were the same ones he advanced in the first round of summary judgment briefing. No intervening event or binding authority has called into question the Court's prior assessment of those arguments, and there is no reason to think the Court made an error of apprehension rather than of reasoning. Singh, 383 F. Supp. 2d at 101 (discussing grounds for reconsideration).

Instead, it appears Talbot was simply unhappy with the Court's conclusions.  But disagreeing with a court's answer to an argument is not proper cause to pursue reconsideration; that is better left to the appellate process.

B.  Renewed Motion for Summary Judgment

Having rejected Talbot's arguments for reconsideration, the Court now turns to the agencies' renewed motion for summary judgment.  The renewed motion concerns the two supplemental searches that the Court required the agencies to conduct in its initial summary judgment decision.  The first concerned the State Department, the second the CIA.

1.  *The State Department*

Talbot's FOIA request of the State Department sought "[a]ll passport and visa records pertaining to former CIA official William King Harvey."  Compl. Ex. 1.  Talbot also provided State with pseudonyms that Harvey may have used.  Statement of Materials Facts as to which there is no Genuine Issue ("SUMF"), ECF No. 17-2 ¶ 4.  State searched for passport records using Harvey's actual name and the pseudonyms, but it limited each of those searches by Harvey's actual birthdate.  Id. ¶¶ 13-16.

The Court found it "unlikely that a CIA officer using a pseudonym would list his real birthdate with the false name rather than a false birthdate" and accordingly ordered a fresh search.  Talbot, 315 F. Supp. 3d at 364.  To guard against an over-inclusive return, the Court adopted Talbot's proposed parameters, including "using a range of birthdates falling within five years of Harvey's actual birthdate" and "limiting the search to passport applications listing planned travel to German or Italy," where Harvey was likely to have traveled during the time period for which records were sought.  Id.

State performed that search and found one match with the Harvey pseudonym "William Walker." Renewed Motion for Summary Judgment, Supplemental Statement of Material Facts as to which there is no Genuine Dispute ("2d SUMF"), ECF No. 30-1 ¶ 4. The agency nevertheless determined that record was a false positive, since the accompanying passport photograph depicted an African-American man and Harvey was white. Id. State thus argues it has complied with the Court's supplemental search order—notwithstanding that the search bore no new fruit—and that it is entitled to summary judgment.

Talbot resists this conclusion, but to no avail. He strings together a couple of inferences—ones he grants are "permissible," not "necessary"—to argue that the photograph could just be Harvey in disguise. Pl's Opp. to Renewed Mot. Summ. J. ("Pl's Opp.") at 9. First, for reasons slightly unclear, Talbot says that it is likely that the passport record was dated between 1960 and 1976. Id. And second, because that date range coincides with CIA efforts to undermine and assassinate Fidel Castro, there is a chance Harvey, under the name William Walker, disguised himself as an African American to "work among Cuban exiles or in parts of the Caribbean basin where a predominant part of the population is of African descent." As support for this theory, Talbot provides excerpts from a book by two former CIA operatives detailing a "quick ethnic change disguise." Second Supplemental Declaration of Dan Hardway, Ex. C. While the Court admires Talbot's fertile imagination—and grants that what he posits is possible—his theory still amounts to speculation, not the sort of "countervailing evidence sufficient to raise a substantial doubt" about the agency's search and its determination that the William Walker record does not pertain to William King Harvey. White v. U.S. Dep't of Justice, 840 F. Supp. 2d 83, 92 (D.D.C. 2012) (quotation omitted).

Therefore, the Court will grant the State Department's renewed motion for summary judgment.

### 2. *The CIA*

Talbot's FOIA request of the CIA also sought records related to Wyatt and Harvey, specifically "[a]ll records pertaining to temporary duty (TDY) travel," "[a]ll passport and visa records," "[a]ll records reflecting assignment to a[] station, post, base, unit or other component of the CIA," and "[a]ll photographs pertaining to" the two from January 1, 1950 to July 1, 1976 for Harvey and from January 1, 1948 to 1975 for Wyatt. Compl. Ex. 6. The CIA conducted the search but did not look in its "operational files," contending that such files were categorically exempt from FOIA under the CIA Information Act, 50 U.S.C. § 3141. Talbot, 315 F. Supp. 3d at 369.

The Court disagreed, concluding instead that a "specific, narrow subset of the possible requested records in operational files—those that would relate to Operation Mongoose or the Castro assassination plots, during the time period of November 1961 to June 1963—fall within the exception" to the operational files exemption under § 3141(c). Id. at 370. As a consequence, the Court ordered the CIA to "search the operational files for the specific universe of non-exempt records . . . or provide an explanation for why it need not do so to perform an adequate search." Id. at 371.

The CIA opted to do the search. The agency searched the Directorate of Operations for Harvey's name and his pseudonyms, Third Declaration of Antoinette Shiner ("3d Shiner Decl.") ¶ 4, ultimately locating 56 potentially responsive documents in its operational files, id. ¶ 5. A "line-by-line review" of those documents, however, determined that none of the files related to William King Harvey, Operation Mongoose, or Castro assassination plots from November 1961

to June 1963. Id. The CIA therefore determined that none of the records in the operational files fall within the 50 U.S.C. § 3141(c) exception to FOIA exemption. Id. Accordingly, the CIA contends it is entitled to summary judgment.

Talbot counters by trying to poke holes in the agency declaration explaining the supplemental search. First, he questions the adequacy of the declaration's description of who conducted the search, what records systems were searched, and the "search strategy." Pl's Opp. at 3. Talbot is right that an agency declaration can provide a basis for granting summary judgment only where it "set[s] forth the search terms and the type of search performing" and "aver[s] that all files likely to contain responsive materials (if such records exist) were searched." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). But the declaration at issue here did just that. The Shiner declaration states *who* conducted the search: "experienced staff within the Information Management Services." 3d Shiner Decl. ¶ 4. It states *what* records were searched: files within the "Directorate of Operations," id., though this was never in much question given that the very purpose of the supplemental search was for the CIA to search its operational files. The declaration then lists exactly *how* the search was conducted: using Harvey's full real name, its component parts, and his two pseudonyms. Id. Finally, the declaration avers that the agency's search would "reasonably be expected to identify responsive documents" within the scope of the Court's supplemental search order and Talbot's initial request. Id. Despite Talbot's criticisms of the Shiner declaration, he provides no barometer in the case law to establish its inadequacy. See, e.g., Pl's Reply at 8-10 (attacking declaration but citing no cases).

Second, Talbot accuses the Shiner declaration of disingenuous word play. Talbot fixates on the declaration's use of "documents" versus "files." The Shiner declaration states that the

agency located 56 potentially responsive "documents," but that its line-by-line review revealed that none of the 56 "files" were responsive. 3d Shiner Decl. ¶ 5. Talbot spies something sinister afoot: "[Shiner] concludes that none of the *documents* found were responsive to Plaintiff's FOIA request," but this "does not follow from the assertion that the *files*" were not responsive. Pl's Opp. at 5 (second emphasis added). The Court reads Shiner's declaration differently. It appears instead that Ms. Shiner used "files" and "documents" interchangeably, as synonyms for one another; at one point, she even uses the two words in the same sentence. 3d Shiner Decl. ¶ 5 (stating that "line-by-line review of those fifty-six documents" found that "none of those files" were responsive). Moreover, even if Shiner were referring to two different things with "documents" and "files," her concluding statement that "there is no responsive information to be released" clears up any purported ambiguity. Id. ¶ 6.

Third, and finally, Talbot contends that the Shiner declaration "def[ies] logic on its very face." Pl's Opp. at 5. Talbot says it cannot be true that a search for "William King Harvey" and his pseudonyms turned up 56 documents that ultimately had nothing to do with William King Harvey. But the Court can think of many logical explanations for that. The agency searched for "William King Harvey," true, but it also searched for "William Harvey" and "Harvey." The search for "Harvey" alone could have yielded all sorts of false positives, pertaining to some other Harvey in the CIA's operational files. The pseudonym search likewise could have generated hits for persons that were not actually William King Harvey; the results of the State Department's search for "William Walker"—turning up a passport record of an African-American man— shows exactly that. In any event, a FOIA requester's incredulity is not enough to overcome the "presumption of good faith" courts normally accord agency declarations. SafeCard, 926 F.2d at 1200.

14

Accordingly, the Court will grant the CIA's renewed motion for summary judgment.

## IV. Conclusion

For the foregoing reasons, the Court will deny Talbot's motion for reconsideration and grant the agencies' renewed motion for summary judgment. A separate Order shall accompany this memorandum opinion.

 

 

 

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  November 16, 2018